No. 45,573

STATE OF KANSAS, *Appellee*, v. MAX POTTS, *Appellant*.

(468 P. 2d 78)

48

Opinion filed April 11, 1970.

*Clark R. Mandigo,* of McDonald, Tinker, Skaer, Quinn and Herrington, of Wichita, argued the cause and was on the brief for the appellant.

*James W. Wilson,* Deputy County Attorney, argued the cause, and *Kent Frizzell,* Attorney General, and *Keith Sanborn,* County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

HATCHER, C.: This is an appeal from a conviction of second degree robbery.

On the evening of January 23, 1968, two young men, Gregory Mitchel and Steve Shirack, went to northeast Wichita in search of some "fun." Shortly after arriving in the area they met Hughie Sanders. The rest of the evening was spent riding around in Hughie Sanders' car looking for a "fun house." During the course of the evening a portion of several different bottles of whiskey were consumed by the riders of the automobile. In their search, their travels took them to several different locations. At each location one or all of the riders would exit the auto and later return.

At their next to last stop, Max Potts, the defendant, joined the three and they went to a house near the intersection of 26th Street and Mosley. When the four occupants arrived at this house they got out of the car. Steve Shirack and Gregory Mitchell led the way. After leaving the automobile Gregory Mitchell was knocked to the ground by Max Potts, and his billfold, keys and other property were taken. The other boy was held at knife point by Hughie Sanders. After the robbery Potts and Sanders drove off in the car. The victims made their way to a filling station where the police were called. Potts and Sanders were later identified through a line-up and later in court by each victim.

Potts was tried and convicted of second degree robbery. He has appealed.

Hughie Sanders, who had remained in jail since his arrest and failure to make bond, was put on the witness stand as a witness for the state. The state being dissatisfied with Sanders' testimony proceeded to read at length the questions and answers from a statement made by Sanders and recorded by a court reporter after

Sanders' arrest. The statements read were incriminating and directly identified Potts as the robber.

The appellant contends:

"The extended reading of Hughie Sanders' extrajudicial statement to the jury violated the defendant's right of confrontation guaranteed under the sixth and fourteenth amendments to the Constitution of the United States and under Section Ten of the Bill of Rights of the Kansas Constitution."

A determination of the contention requires a consideration of the statement and the circumstances under which the questions and answers therein were read.

When Hughie Sanders was made a witness by the state, it was no doubt believed that his testimony would be in line with his previous statement. However, when questioned about the preliminaries leading up to robbery on the evening of January 23, 1968, his answers were very evasive. He answered that he did not know or that he could not remember.

Counsel for the state requested permission to ask leading questions. The court declared the witness to be hostile and evasive and granted permission. We extract the following:

"Q. Hughie, what else do you remember about that night?

"A. I don't know which night you're talking about.

"Q. The night these two blond headed boys were with you and Max Potts in your brother-in-law's Pontiac. Do you remember meeting them down in the vicinity of the 1100 block on Murdock?

"A. Meeting who down there on Murdock? Blond headed boys (remainder inaudible). No, sir, I don't remember.

"Q. How come you don't remember, Hughie?

"A. How come I don't remember?

"Q. Um-hum.

"A. *Because it never happened.*" (Emphasis supplied.)

Again he was questioned:

"Q. (By Mr. Foster) Your lawyer asked you the next question, 'And you later got some more booze?' And your answer was, 'Yeah.' Your lawyer asked you, 'And then what happened?' And you said, 'Well, we took them out in the country.' And your lawyer asked you, 'When did you see Max Potts? How early did he get together with you and the other two people that you have named?' And your answer was, 'You had been with them for some little time yourself before Max Potts—' Your answer was, 'Yes.' He then finished and said, 'Got together with you all?' And you answered, 'Yes.' Turning now to page 4, 'Yes,' and you said, 'Yes.' "

His answer was, "I don't remember."

Hughie Sanders was then questioned:

"Q. All right. Do you remember going into the north part of town on the other side of 21st Street?

"A. Yeah.

"Q. Okay. What happened then?

"A. Well, I usually drive there and pick up my sister from work. She used to work out there on 37th Street, somewhere in there. I used to go out there all the time.

"Q. Do you remember being there this night last January with Max Potts and these two blond headed boys?

"A. *I never did go with him.*

"Q. You never did go there?

"A. (No further response.)

"Q. Referring to Page 4 of the transcript, your lawyer asked you the question, 'Where did you first see Max Potts?' And you answered, 'On the corner of Murdock and Ohio.' Your lawyer asked, 'Did he get into your car?' And you said, 'Yeah.' Your lawyer asked you, 'Then where did you go?' You said, 'Went out to the north part of town.' Your lawyer asked you, 'How far north, approximately?' You said, 'Oh, about—just on the other side of 21st Street.'

"Mr. LESTER: I object again, Your Honor. He's not even putting this matter in question form. He's trying to get him—

"THE COURT: (Interrupting) I think you should ask this witness if he made those statements rather than just read the transcript.

"Mr. FOSTER: That's what I did, Judge. I covered that segment and that is the segment I was going to cover and ask him like I did a few minutes ago, take this segment at a time and see how his memory is.

. . . . . . . . . . . . .

"Q. Do you remember being out on—I think it was Mosley, or it is a sandy street up there across 21st Street with Max Potts and these two boys when you stopped your car and all four of you got out?

"A. *No. I told you, Max Potts, he don't go with me. I don't even like the man.*

"Q. How long—

"A. *I don't know what he be doing with me.*

"Mr. FOSTER: I refer the Court's attention to Page 4 again of the transcript.

"Q. (By Mr. Foster) After you told us you went up to just the other side of 21st Street, your lawyer asked you, 'Then what happened?' You said, 'We got out to go into some house and there one Max L. Potts did hit one of the guys that was with us and presumably took some money off of him.'" (Emphasis supplied.)

## We conclude with the following:

"Mr. FOSTER: Directing the Court's attention to Page 5 of the transcript—

"Q. (By Mr. Foster) Your lawyer asked you, 'What were you going into the house for?' And your answer was, 'Oh, supposed to have been a house of prostitution.' Your lawyer said, 'Had someone told these people Shirack and Mitchell that it was a house of prostitution?' And you said, 'We all was advised it was a house of prostitution.' Your lawyer said, 'Advised by whom?' And you said, 'Well, I don't know. I got that information from Potts and he

got it from someone else.' Do you remember those questions being asked you?

"A. (Witness shakes head in the negative.)

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Okay. He then asked you, 'You say Potts hit one of the two people?' And you said, 'Yes, sir. The boy was—I saw the boy fall and I presumed that he got the money off of him. Actually, I didn't receive any part of it. However, I was told that he was—that he didn't have any money on him.'

"Do you remember that question and answer?

"A. Who had some money on him?

"Q. One of these two blond headed boys by the name of Mitchell and Shirack. You told us Potts knocked him down, but Potts told you he didn't have any money on him.

"A. I don't remember that.

"Q. Okay. Then I asked you, 'Hughie, how long have you know Max Potts?' And you said, 'Approximately eleven—approximately eleven years.' Then I asked you, 'There is no question in your mind that he was the man you picked up at Murdock and Ohio?' And you said, 'No, sir.'

"Do you remember me asking you those questions?

"A. (Witness shakes head in the negative.)"

The above extracts from Hughie Sanders' testimony will suffice to demonstrate the nature of the issue we have before us.

The appellant relies on *Pointer v. Texas,* 380 U. S. 400, 13 L. ed. 2d 923, 85 S. Ct. 1065 and *State v. Hooks,* 202 Kan. 68, 446 P. 2d 770 to support his contention that the reading of the questions and answers from Sanders' former statement denied the accused the constitutional right to confront the witnesses testifying against him.

Both of the above cases dealt with statements, depositions or testimony sought to be used as direct evidence against the defendant. The appellee concedes that this cannot be done but it does contend that the presence of the defendant when the contradictory statements were made is not necessary to make the statements admissible since the purpose of showing them is not to bind the defendant but to impeach the witness. With this we must agree.

It is the rule in this state that where it appears a party is genuinely surprised by adverse testimony from his own witness, the trial court may, in its discretion, allow the party calling the witness to cross-examine and to interrogate him as to prior contradictory statements. A party may impeach his own witness to such an extent. K. S. A. 60-422 grants impeachment privileges to a party calling the witness. In case of surprise the state has long been granted the privilege of impeaching its own witness. (*State v. Smarsh,* 117 Kan. 238, 231 Pac. 52.)

As a rule the mere fact that a witness has failed to testify as ex-

pected does not warrant impeachment by proof of prior statements in conformity with what he was expected to testify but the testimony given must be affirmative, contradictory and adverse to the party calling him. (*Hancock v. Bevins*, 135 Kan. 195, 9 P. 2d 634; *Williams v. Hendrickson*, 189 Kan. 673, 371 P. 2d 188.)

The appellant contends that the witness gave no adverse testimony but only stated he did not know or could not remember. We cannot agree.

Before the appellee asked permission to cross-examine the witness testified that he did not remember meeting the two blond boys "because it never happened." Later, when asked if he remembered meeting with Max Potts and the two blond boys on the evening in January, he stated, "I never did go with him." Again, he testified—"I told you, Max Potts, he don't go with me. I don't even like the man."

Such testimony was affirmative, adverse and very damaging to the appellee's case. Potts had to be placed at the scene of the robbery to be convicted. It is under just such circumstances that impeachment is justified.

In *State v. Jones*, 202 Kan. 31, 48, 446 P. 2d 851, we said:

". . . It is well settled that prior inconsistent statements made by a witness out of court may be shown to impair his credibility. (*State v. Donahue*, 197 Kan. 317, 416 P. 2d 287.) The rule is stated in *State v. Sorter*, 52 Kan. 531, 34 Pac. 1036, where it was held:

" 'While ordinarily a party may not impeach his own witnesses, nor offer evidence for that purpose, he is not conclusively bound by the statements which the witness may make; and where a party has been entrapped or deceived by an artful or hostile witness, he may examine such witness as to whether he had not previously made contrary statements; and may, in the discretion of the court, be permitted to show what such contrary statements were.' (Syl. ¶ 5.)

"Cases which have followed *Sorter* are *State v. Hamilton*, 74 Kan. 461, 87 Pac. 363; *State v. Terry*, 98 Kan. 796, 161 Pac. 905; *State v. Cole*, 136 Kan. 381, 15 P. 2d 452; *State v. Olthoff*, 141 Kan. 70, 40 P. 2d 384, and *State v. Barnes*, 164 Kan. 424, 190 P. 2d 193. The state had a right to reply on Mrs. Hopson's prior statements under oath, and her deviation therefrom during the course of the trial left the state with no alternative but to impeach her by the use of her prior inconsistent statement. (K. S. A. 60-422 [a].)"

The appellant objects to the trial court's instructions and the prosecutor's statements thereon in his closing arguments.

In Instruction No. 11, the trial court gave the usual instruction on the credit to be given the testimony of an accomplice. Instruction No. 12 is as follows:

"You are instructed that out-of-court statements admitted into evidence to impeach the testimony of Hughie Sanders are to be considered solely for the purpose of impeaching his credibility and are not to be considered by you as evidence for any other purpose."

Counsel for appellee commented on these instructions in his closing argument.

The appellant now contends that the instructions and the comments of appellee's attorney thereon tended to stress the error of the trial court in permitting counsel for appellee to cross-examine Sanders and impeach his credibility by reading to him questions and answers from a previous statement.

What has been previously said disposes of this issue—there was no error in the cross-examination and impeachment of the witness.

We might also state that objections were not made to the instructions or the closing argument of counsel.

Technical objections to the trial court's instructions raised for the first time on appeal will not be considered on appeal. (*State v. Greer,* 202 Kan. 212, 447 P. 2d 837.) Argument of counsel not objected to at time is not reviewable on appeal. (*Watkins Co. v. Hanson,* 185 Kan. 758, 347 P. 2d 447; *State v. Jones,* 137 Kan. 273, 20 P. 2d 514.)

Appellant further contends that since the statement of Sanders was not introduced in evidence it was error for counsel for appellee to comment on the impeaching statement. The case of *State v. Gauger,* 200 Kan. 515, 438 P. 2d 455 is cited as authority for the contention. In the *Gauger* case we did say that it was improper for the court to permit counsel in his closing argument to refer to the contents of a written matter not in evidence for the purpose of impeachment. However, where the questions and answers are read to the witness from the statement and included in the record, and there is no claim that they were not read accurately, there is no necessity for introducing the statement itself. The questions and answers referred to by counsel from the statement were before the jury. The reporter who recorded the statement took the witness stand and identified it as that of Hughie Sanders.

In *State v. Lopez,* 182 Kan. 46, 318 P. 2d 662, we stated at page 50 of the opinion:

". . . In summing up a case before a jury, counsel may not introduce or comment on facts outside the evidence, but reasonable inferences may be drawn from the evidence and considerable latitude is allowed in the discussion of it in which he may use illustrations and appeal to the jury with all the power

and persuasiveness which his learning, skill and experience enable him to use. (*State v. Wilson,* 108 Kan. 433, 195 Pac. 618.)   .   .   ."

It might again be noted that there was no objection made to this part of counsel's closing argument.

The appellant addressed his last objection to the mental competency of Hughie Sanders to testify. The question was addressed to the sound discretion of the trial court and he found the witness competent. (*Holler v. Dickey Clay Mfg. Co.,* 157 Kan. 355, 139 P. 2d 846.) We find no reason to disturb the finding.

A careful examination of the record discloses no trial errors that would justify the granting of a new trial.

The judgment is affirmed.

APPROVED BY THE COURT.