No. 82,447

STATE OF KANSAS, *Appellee*, v. FAYVUN MANNING, *Appellant*.

(19 P.3d 84)

Opinion filed March 9, 2001.

*Craig H. Durham*, assistant appellant defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the briefs for appellant.

*Terra D. Morehead*, assistant district attorney, argued the cause, and *Daniel Cahill*, assistant district attorney, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the appellant, Fayvun Manning, of his convictions by a jury of one count of first-degree felony murder and one count of aggravated robbery. The victim, Beverly Chatmon, was shot on December 26, 1997, as she was tending the cash register at a liquor store in Kansas City, Kansas. She died as a result of the gunshot wound.

Leroy Bartlett, Chatmon's husband, owned the liquor store and a party shop in Kansas City, Kansas. The two stores are in the same building but are separated by a wall. The only connection between the stores is a small glass window in the wall. It is difficult to communicate through the window because it does not open and the view of each store through the window is opaque.

Kwaine Young, Chatmon's young adult son, was working in the party shop on December 26, 1997, while his mother was tending the cash register in the liquor store. Late in the afternoon, he heard a loud noise coming from the liquor store. Young looked out of a window in the party shop after he heard the noise and saw a black man, about 6'1" and 180 pounds, walking by the window fairly quickly. The man was wearing a blue sweatshirt with something covering his head, such as a hood or a beanie. He was also carrying a small box that looked like a milk crate. Young admitted that he did not get a good look at the man and he never identified him.

After hearing the loud noise, Young went to the small window that separates the two stores. He could not see his mother, so he called for her, thinking that she had knocked something over, but he received no response. Young decided to check on her. As he

was leaving the party shop side of the building, he noticed a "70s style," blue van with a "teardrop" window drive away.

Before it pulled away, the van had been parked some distance behind Alfred Anderson's car. Anderson, a regular customer at the liquor store, had just been inside to buy a can of beer and to visit with Chatmon. He had just returned to his vehicle when he noticed a young black man go into the liquor store. The man was about 5'9" 5'10" tall, wearing dark clothing, with a hood over his head. He was walking in a casual manner with his back to Anderson.

Anderson soon noticed the man reappear from the liquor store, walking as casually as before to a dark van parked over 100 feet behind him. The man got into the van and it pulled away. The driver did not appear to be in a hurry, and the van left without squealing tires or speeding away.

After the van pulled away, Young rushed out of the liquor store yelling something that Anderson did not understand. He followed Young inside and saw Chatmon lying on the floor bleeding from the left side of her jaw. Chatmon had been shot. She later died of complications from the gunshot wound. Several items were missing from the liquor store, including cash, some papers, a strongbox, and a milk crate.

The State's theory that Manning shot Chatmon was based largely upon the testimony of Arlandar McAbee and Lisa McKenzie, who had waited in the getaway van but denied having prior knowledge there would be a robbery or murder. They both testified that Manning was the triggerman. Manning defended on the theory that he was not present during the shooting and that the individuals who testified against him were not credible because they were heavy drug users who were involved in the criminal activity themselves.

## MCABEE'S TESTIMONY

On the same day as the shooting, McAbee stopped at a friend's house acting panicky and nervous. McAbee is a crack cocaine addict, a burglar, and a thief who has been in and out of jail. On the day of the robbery and shooting, McAbee had been smoking crack cocaine consistently. McAbee told his friend that he was involved in the shooting at the liquor store, and the friend claimed that

McAbee said that he thought some of his "partners" shot people in the store. McAbee also sold some liquor from the liquor store to his friend while he was at his house and used the proceeds to buy more crack.

The police arrested McAbee that next day. He was taken to the police station where he waived his *Miranda* rights and gave the police a statement because he was worried that if he did not he would be implicated in the crime. McAbee claimed that he, McKenzie, and Williams were in Williams' van smoking crack on December 26, 1997. They went to a house in Kansas City, Kansas, at McKenzie's suggestion, so that they could get more crack "on credit" from a man she knew. McKenzie went into the house and returned, telling her friends that the man was willing to give them a $20 rock on credit if they would give him a ride to the liquor store. They agreed. McAbee claimed that the man was Manning.

The four then proceeded to Bartlett's liquor store. According to McAbee, Manning told Williams to get him a 40-ounce beer from the store. Williams got out of the van and disappeared in the store. When he came back, Manning got out of the van and he and Williams passed each other immediately outside of the van. The next thing McAbee remembered is that Manning returned to the van carrying a milk crate that contained bottles of alcohol, a box, and some other items. McAbee testified that Manning pulled a gun, placed it to McKenzie's head, and said to her "bitch, drive" and that he would "blow her fuckin' head off" if she did not drive him back to his house. She drove him back to his house where he departed with the milk crate, leaving behind some bottles of liquor. Those were the bottles that McAbee sold for more crack.

## MCKENZIE'S TESTIMONY

The police also brought McKenzie in for questioning and took her statement. She also testified at trial. According to McKenzie, she, McAbee, and Williams were "hanging out" in Williams' van on the day of the shooting. McKenzie, like McAbee, is a crack cocaine user and a street person. McKenzie testified that when they picked Manning up from his house, she noticed that he had

a gun but she did not worry about it because everybody she knew carried a gun.

Once they arrived at the liquor store, Williams got out of the van and went into the store to get a beer. McKenzie claimed that Manning got out of the van and passed Williams at the entrance of the liquor store. She testified that Williams exclaimed, "The MF is doing it," as he got into the van. She claimed that it was then, and only then, that it dawned on her that this might be a robbery. McAbee, on the other hand, did not remember anyone saying anything specific during the time that Manning was in the store.

In McKenzie's testimony, Manning returned to the van carrying a milk crate with a cash register drawer on top. McKenzie's testimony, however, differed from McAbee's testimony in that she could not recall Manning pointing a gun to her head, telling her to drive or he would "blow her fucking head off." McKenzie claimed that while in the van Williams asked Manning if he hurt the woman in the liquor store and, after Manning said no, Williams asked him to swear to it. McKenzie claimed that Manning hesitated and then said that "she was going to call the police." McKenzie dropped Manning off at his home. She took $10 from him and left with Williams and McAbee.

Williams was not located for trial and did not testify.

## CANADY'S TESTIMONY

Angela Canady, Manning's mother, also became involved in this case. Like the other witnesses upon which this case is based, Canady is a drug and alcohol abuser who often lives on the streets. At the time of the robbery and shooting, Canady and her son were arguing constantly and because she was smoking "wet" (which is some substance dipped in morphine) and other drugs, she was "paralyzed" much of the time.

Canady called the police soon after the robbery and shooting. She told them that the shooter was Manning. The police took a formal statement from her in which she stated that Manning returned to his house on the day of the shooting in an older model cream or brown van carrying a red crate with a number of items contained within, including cash, jewelry, liquor, and a silver hand-

gun in a Crown Royal bag. Canady said Manning dumped the items on the floor and that she noticed some papers and car titles with the name "Leroy Barnett" on them. Canady also claimed to overhear Manning tell a few people that he "hit a liquor store on 7th street" and that he had to kill the woman because he thought she was going for the alarm. She claimed that Manning or someone later took some of the papers and tried to burn them in a Chinese wok.

Based upon Canady's statements, the police received and executed a search warrant of the house. Inside they found various items that were identified as coming from Bartlett's liquor store and that some of the papers had been partially burned.

At trial, Canady was a recalcitrant witness. She repeatedly stated that she did not remember, or did not know, most of the substance of her formal police statement or most of what occurred on the day of the shooting. She testified that she was afraid of Manning at the time; that they had been arguing and fighting constantly; and that she called the police because she believed somebody was trying to kill her son. The State was permitted to treat Canady as a hostile witness and cross-examine her using her pretrial statement, over defense counsel's objection. The statement was also introduced through a police detective's testimony and as an exhibit.

## MANNING'S TESTIMONY

Manning testified at trial in his own defense as follows:

On the day of the shooting, Manning was at his house with a few other people, including his ex-girlfriend and his cousin. Manning was not well acquainted with McKenzie, Williams, or McAbee when they came to his house that day. Manning admitted that he sold crack cocaine to supplement his income and that he believed these individuals came by his house to purchase some crack. Manning told them that he did not have any, so they offered to sell him a milk crate full of various items. After haggling over the price, Manning gave them $30. McKenzie, Williams, and McAbee left, returned a short time later, and demanded another $20. Manning refused, but admitted that he "ripped these people off" for the additional $20.

When he brought the milk crate into his house, he discovered that it contained various paper items, some coins in a cash register drawer, and liquor bottles. He denied that he burned any of the items, instead insisting that it was his mother who placed them on a dryer in a utility room and burned them. He also claimed that he and his mother had a history of arguments and fights; that she was a chronic drug abuser; and that he did not do the things that she attributed to him in her statement. He testified that he did not leave the house to go to the Bartlett liquor store on December 26, 1997, and that he did not rob the store or shoot Chatmon. His ex-girlfriend and his cousin also testified that he did not leave the house that day.

The jury ultimately convicted Manning of one count of first-degree felony murder and one count of aggravated robbery. The trial court sentenced him to life without the possibility of parole for 15 years for the felony murder and 51 months for the aggravated robbery, to run consecutive to the life sentence.

Manning raises four issues on appeal: (1) whether the trial court erred when it declared Canady a hostile witness and allowed the State to examine her regarding her statement she made to the police; (2) whether the trial court erred when it refused to excuse a juror for cause and forced Manning to use a peremptory challenge; (3) whether the trial court erred when it refused to grant a mistrial following a police officer's testimony; and (4) whether the State improperly cross-examined Manning by asking him to comment on the veracity of the State's witnesses.

## I. DECLARATION OF HOSTILE WITNESS

Manning argues that the trial court erred when it declared Canady a hostile witness and allowed the State to examine her regarding the statement she gave to the police even though she claimed no recollection of the statement during trial.

The determination of whether a witness is hostile is within the discretion of the trial court and is based upon the demeanor of the witness, the witness' situation and relationship to and with the parties, the witness' interest in the case, and the inducements he or

she may have for withholding the truth. *State v. Hobson*, 234 Kan. 133, 147, 671 P.2d 1365 (1983).

Canady initially gave police a statement that Manning was involved in the robbery of the liquor store and that she overheard him tell a friend that he had shot the clerk because she was going to call the police. Canady also told officers that she had seen him come home with a milk crate full of items such as papers, money, and liquor bottles. Her information was instrumental in obtaining a search warrant for the home.

At trial, however, Canady was less than helpful to the State. Her answers were evasive and she responded over and over again that she did not remember about the events that occurred the day of the shooting. The State was eventually permitted to treat Canady as a hostile witness and to cross-examine her. Specifically, the trial court stated:

> "All right, I think it's obvious to me at this point this witness is an adverse witness, and I'm going to allow you to ask the witness questions up to this point. I do think you had established that. From what I heard, she is obviously reluctant to testify. She doesn't like you. She's hostile. And I don't know if she likes [counsel for defendant] or not.
>
> . . . .
>
> "[S]he hasn't refused to answer. She obviously is very hostile, she is very—in her own words, she said she is reluctant to say anything. I believe that it is quite incredible that she can't remember anything that happened this particular date, and I believe at this time that to establish the fact that she is a hostile witness now, when you are asking the same questions, don't argue with her. You can ask her, did you say this or whatever, but let's move on."

Manning objected to the ruling of the trial court. Manning argued then and contends now that Canady did not remember the events which occurred the day of the shooting, nor does she have any memory of her meeting with officers. Manning argues that because Canady was not able to remember the events, the State should not have been able to declare her a "hostile" witness and subsequently introduce into evidence statements she made to officers which she can no longer remember. During examination by the State, the following took place concerning Canady's statements she made to the police and the events the day of the shooting:

"Q. Now, when we left here, Angela, we were talking about when [Manning] and the boys went in the bathroom, you went over to be nosey, didn't you; isn't that what you said, you went over there to be nosey?

"A. (No response.)

"Q. Is that a yes or no?

"A. I have no idea.

"Q. And then you heard [Manning] tell one of the boys that was there, that he had hit a liquor store on 7th Street; didn't you?

"A. I don't remember saying that.

"Q. I'm not asking you if you remember saying that. I'm asking you if you remember hearing it.

"A. No.

"Q. Do you remember hearing [Manning] say that?

"A. No.

"Q. Did you hear [Manning] say that?

"A. I don't remember hearing it.

"Q. Do you recall your hearing it?

"A. I don't remember it.

"Q. You recall this day perfectly well?

"A. Who?

"Q. This day for the—that we have been talking about for the last hour or so?

"A. This day?

"Q. The day that we have been talking about, the day that [Manning] came home with the tin box and milk crate full of liquor, that day?

"A. Oh, okay.

"Q. You remember that day, don't you, because you had been talking about it?

"A. I remember some things on that day, yes, I do.

"Q. And you talked to the detective about that day? You remember what you said, you remember talking to Detective Shomin?

"A. Yeah, I remember talking to him. I remember walking up in the office, I do remember.

"Q. You remember the day you talked to Detective Shomin perfectly well?

"A. No, I don't. I really don't.

. . . .

"Q. So you heard [Manning] say that he hit that liquor store?

"A. I don't know what I heard anybody say.

"Q. Did you hear him say he had the boy in the van [go in] first?

"A. Did I hear who said?

"Q. [Manning] say that?

"A. I don't know. I don't know.

"Q. Did you hear him say that he went in behind him?

"A. I don't know.

. . . .

"Q. You heard [Manning] say he was telling these boys what he had done, and you heard him say he called the lady a name . . . and he told her to hold her hands up. You heard him say that?

"A. He told who to hold her hands up?

"Q. We're talking about this conversation that you listened to in the bedroom when [Manning] was talking to these boys?

"A. I don't remember even hearing a conversation now.

. . . .

"Q. You heard [Manning] tell these boys that he told the lady you be quiet, don't you say nothing.

"A. I don't remember saying that.

"Q. Okay, and you heard him say as he was going out the door with a gun on the dude, the man in front, but that he looked back and it looked like she pushed the alarm, so he said he had to kill her. You heard [Manning] say that?

"A. I don't remember saying all that. Where are you seeing this?

"Q. Page 7 at the very top of it, where you told the detective what you heard. (Indicating.)

"Q. You got that whole paragraph? Did you read it?

"A. Yeap, yeah, I read it.

"Q. You didn't say that?

"A. I don't recall saying that. It really don't sound right.

"Q. Why doesn't it sound right?

"A. Like it just don't sound like something I'd say, or it doesn't sound like something I heard rather.

"Q. So you didn't hear [Manning] say those things?

"A. I don't know.

"Q. What do you mean you don't know?

"A. I just don't remember if I heard [Manning] say this stuff or not. I mean, look at all this stuff.

"Q. Do you remember [Manning] saying that he killed somebody?

"A. No, uh-uh.

. . . .

"Q. Did you say that [Manning] shot this lady?

"A. Did I—did I say that?

"Q. Yes.

"A. No, I couldn't have said that.

"Q. Later, the question was: [Manning] said—to which they say you answered: He said: I had to shoot. [Manning] said, I had to shoot her. He didn't say that either?

"A. I don't remember him sayin' that.

"Q. Do you remember telling the detective that?

"A. I don't remember it at all, you're the first one hearing it. I mean, it's wrote down on here.

"Q. Are you telling me ma'am, that it's possible?

"A. I'm telling you I don't know.

"Q. Is it—are you telling it's possible that your son came home with all this loot, the liquor, both milk crates, tin boxes, things like that, and you remember that because you talked about that earlier?

"A. I remember liquor.

"Q. You talked about the strong box, you remember that?

"A. What's a strong box? No.

"Q. You remember at the time, a metal box was dumped out on the floor?

"A. No, this is what I told you, I remember seeing money on the floor, a lot of money on the floor, coins."

A defendant charged with a crime is entitled to a right of confrontation. The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions the accused shall enjoy the right to be confronted with the witnesses against him or her. A similar provision in § 10 of the Kansas Constitution Bill of Rights provides that in all prosecutions the accused shall be allowed to meet the witnesses face to face. *State v. Terry*, 202 Kan. 599, 601, 451 P.2d 211 (1969).

K.S.A. 2000 Supp. 60-460 governs out-of-court statements and the hearsay rule. It sets forth in pertinent part:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and is inadmissible except:

(a) *Previous statements of persons present.* A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

K.S.A. 2000 Supp. 60-243(b) governs the scope of examination and cross-examination and sets forth:

"A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate such witness by leading questions and contradict such witness and impeach such witness in all respects as if such witness had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of such witness' examination in chief."

Where a party has been entrapped or deceived by an artful or hostile witness, he or she may examine such witness as to whether the witness had not previously made contrary statements, and may, in the discretion of the court, be permitted to show what the contrary statements were. K.S.A. 60-422 grants impeachment privileges to a party calling the witness. The mere fact that a witness has failed to testify as expected does not warrant impeachment by proof of prior statements in conformity with what the witness was expected to testify, but the testimony given must be affirmative, contradictory, and adverse to the party calling the witness. *State v. Potts*, 205 Kan. 47, 51-52, 468 P.2d 78 (1970).

The parties cite several cases in support of their position. A brief review is necessary. Manning cites *State v. Lomax & Williams*, 227 Kan. 651, 608 P.2d 959 (1980). In *Lomax & Williams,* the appellants argued on appeal that their Sixth Amendment right to confront the witnesses against them was violated when the State presented testimony of Mary Ellen Bagby which was previously given under oath at a preliminary hearing for another defendant. Bagby testified at the preliminary hearing that she was present at the time of the robbery of which the defendants were accused and identified the defendants as the perpetrators of the robbery. At trial, however, Bagby stated that she was not going to testify because she could not remember anything that had happened on that day. The prosecutor asked the court to declare Bagby a hostile witness and to be allowed to ask her leading questions. Over objections of the defendants, the court ruled that the prosecutor could cross-examine Bagby on her prior inconsistent statements if it appeared during her testimony that she was a hostile witness. When Bagby took the stand to testify, she was evasive concerning the events on the day of the robbery. Bagby responded to each and every question by either saying that she did not remember or could not recall the events on the day in question. When Bagby was examined by defense attorneys, she also stated that she could not remember what had happened. This court held that the trial court erred in allowing the State to question Bagby with the use of her previous preliminary hearing testimony and that it was error to declare her a hostile witness. We stated:

"The record reflects that Bagby's memory was adequate as to other events but she claimed a complete loss of memory as to the identification of the three defendants and the happenings that occurred on December 9 at Leon Smith's residence. . . .

. . . .

"[E]vidence of prior hearsay statements cannot be used to impeach a witness who simply refuses to testify or testifies that he cannot remember anything. . . .

"[W]here a prosecution witness refuses to take an oath or refuses to give testimony of any sort or responds with answers such as, 'I don't recall' or 'I don't know,' his prior hearsay statements are not admissible under the constitutional confrontation rule. . . .

. . . .

"[W]e have concluded that the witness, Mary Ellen Bagby, was not *available for cross-examination* by the defendants, Lomax and Williams. Hence, it was error to admit the prior testimony of Bagby presented at the preliminary hearing of Cashley Woods where the defendants, Lomax and Williams, were not afforded the right of cross-examination. Mary Ellen Bagby was obviously a recalcitrant witness from the beginning. She testified at the Woods preliminary hearing only when she was threatened with punishment for contempt. When called as a witness at the trial of Lomax and Williams, she again refused to testify stating that she could not recall what happened. Although she failed to testify as hoped for by the State, her testimony was not affirmative, contradictory, or adverse to the party calling her as required by *State v. Potts*, 205 Kan. 47 [,468 P.2d 78 (1970)]. *She simply refused to testify, claiming that she could not remember. We interpret the evidentiary record to establish a clear case where a witness simply refused to testify at the trial, using as a vehicle a claim that she could not remember what happened. This is not a case where a witness, acting in good faith, was unable to testify as to the subject matter of her prior statement because, through no fault of her own, she had lost her memory in regard to such events.* . . . The prior testimony of Mary Ellen Bagby was not admissible for the reason that, although present at the hearing, she was not available for cross-examination. The admission of Bagby's testimony violated the defendant's right to confrontation as provided for in the United States and Kansas Constitutions." (Emphasis added.) 227 Kan. at 656-662.

The State, on the other hand, references *Hobson*, 234 Kan. 133, in support of its position. In *Hobson*, the defendant was charged with first-degree murder and conspiracy to commit murder. During their investigation of the murder, detectives spoke with Suzanne, the sister of the victim and daughter of the defendant, about what she had heard her mother say about the killing. Suzanne told detectives that her mother had said that "something had to be done about [the victim]" and that she had told her son to "get rid of

him." 234 Kan. at 136. Suzanne also told detectives that a few days later her mother told her that Jimmy had taken the victim out and "took care of him." 234 Kan. at 136. Detectives made an audiotape of Suzanne's statements.

When asked on direct examination at trial what she had heard her mother say about the killings, Suzanne testified that she did not hear anything. The prosecutor attempted to question Suzanne about the contradictory statements she had made during her interview with detectives. Hobson objected, but the State argued that Suzanne was a turncoat witness and that pursuant to 60-243(b) they were entitled to cross-examine her and ask her leading questions. The trial court subsequently directed the State to allow Suzanne to refresh her memory with a transcript of the interview. Suzanne refused to read through the transcript, stating that she remembered what she said during the interview. After further questioning by the prosecutor, however, Suzanne stated that she did not recall any more about the conversation between her mother and one of the other defendants. The trial court ruled that Suzanne was a hostile witness. The State was then allowed to cross-examine Suzanne and used her statement and interview with police as the chief means of impeaching her. One of the detectives who took Suzanne's statement also testified. On appeal, this court held that the trial court did not abuse its discretion in declaring Suzanne a hostile witness and that the trial court did not err in allowing the introduction of Suzanne's out-of-court tape-recorded statement to the detectives. We stated:

"Suzanne was cross-examined at length by defense counsel concerning these and other statements made during the interview. During cross-examination she did not suffer any apparent loss of memory concerning her prior statements. . . .

. . . .

"The appellant contends there is absolutely nothing in Suzanne's testimony which indicates in any way she was hostile. We disagree. Suzanne denied overhearing any conversation between her mother and Jimmy, rather than merely claiming she couldn't remember, as the appellant contends. Evidence of this conversation was necessary to support the charges against the accused. Suzanne's testimony was affirmative, contradictory and very damaging to the State's case. . . . [T]he trial court did not abuse its discretion in declaring Suzanne hostile. The evidence of her prior inconsistent statements was admissible as substan-

tive evidence, as well as for the purpose of impeachment. . . ." (Emphasis added.) 234 Kan. at 146-47.

We distinguished *Hobson* from the facts in *Lomax & Williams* because in *Hobson* the witness did not claim that she could not remember what had been said but had changed her story and said that she did not overhear anything. In *Lomax & Williams*, on the other hand, the witness refused to testify and used her "memory loss" "as a vehicle" to keep her from testifying.

The State also points to *State v. Osby*, 246 Kan. 621, 793 P.2d 243 (1990). In *Osby*, the appellant, who was charged with aggravated kidnapping, kidnapping, and unlawful possession of a firearm, argued that the trial court erred in admitting transcripts of a portion of the testimony of Robert Taylor and Matthew Issac from the trials of the other defendants. Osby did not have the opportunity to cross-examine the witnesses at the prior trials. At Osby's trial, Taylor stated that he could not remember how many people with guns had been at the house the day of the kidnappings. The prosecution tried unsuccessfully to refresh Taylor's recollection by reading from a transcript of his prior testimony. Isaac also testified that he could not remember who was at the house the night of the kidnapping. Prosecutors were not able to refresh his memory with the transcript of his prior testimony. This court held that the trial court did not err when it allowed the State to introduce portions of Taylor's and Issac's previous testimony. In doing so, we stated:

"When the State attempted to refresh their recollections regarding the events, they still could not remember what had happened. Thus, Taylor and Issac's testimony in this case was contradictory to their prior testimony; therefore, the prior testimony was admissible as a matter of judicial discretion pursuant to K.S.A. 60-422(b).

. . . .

"The prior testimony of Taylor and Isaac was [also] admissible under K.S.A. 1989 Supp. 60-460(a). *The facts of the instant case dictate the application of our ruling in* Hobson *rather than* Lomax & Williams. *Isaac testified Osby was at the house on Vassar Street on the critical date. Taylor also testified Osby was there. At Osby's trial, their memories were selective. They did not 'refuse to testify' as did the witness Bagby in* Lomax & Williams. Bagby had stated she was not going to testify because she could not remember anything that had occurred. When on the stand, her response to *all questions* as to what had occurred on the critical day was that she did not remember. [Citation omitted.]

"Issac and Taylor were available for cross-examination within the purview of K.S.A. 1989 Supp. 60-460(a)." (Emphasis added.) 246 Kan. at 631-33.

In the present case, Canady "refused to testify" throughout her examination based on her memory loss, as Bagby had done in *Lomax & Williams*. Over and over again, Canady repeated to the prosecutor that she could not remember. Canady's testimony was not "affirmative, contradictory or adverse" like Suzanne's testimony in *Hobson* when Suzanne denied that the events had happened at all, although Canady's testimony was very hostile. Canady admitted that Manning had spoken with some men in the bathroom of the house and did not deny that she had overheard the conversation as Suzanne had done in *Hobson*. Canady stated that she could not remember what was said.

Parts of Canady's testimony, however, resemble the testimony of Taylor and Isaac in *Osby*. Canady's memory was selective. She remembered the liquor bottles, the milk crate, the tin box, and the money on the floor. She remembered the van pulling up to the house and remembered seeing Manning by the van. At one point in the examination, Canady admitted that she remembered some events from the day of the shooting but could not remember others. Canady remembered talking with Detective Shomin but could not put the pieces together regarding the content of their conversation when she was examined at trial. A thorough examination of the record reveals that Canady's memory was selective regarding the events the day of the shooting and closely resembles the testimony of Taylor and Isaac in *Osby*.

Although Canady's testimony was not "affirmative, contradictory or adverse," her memory was selective and justifies application of *Osby*. The trial court did not abuse its discretion in allowing the State to introduce Canady's statement to police. Canady was available for cross-examination pursuant to 60-460(a). Manning's Sixth Amendment rights under the United States Constitution and his rights under § 10 of the Kansas Constitution Bill of Rights were not violated.

## II. PEREMPTORY CHALLENGES

Manning next argues that his Fifth Amendment due process rights were violated when he was forced to use one of his peremp-

tory challenges to excuse a juror that should have been excused for cause by the trial court.

The purpose of the voir dire examination is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality. The nature and scope of the voir dire examination is within the sound discretion of the trial court. *State v. Aikins*, 261 Kan. 346, 365, 932 P.2d 408 (1997).

A juror may be challenged for cause when the juror's state of mind with reference to the case or any of the parties is such that the court determines there is doubt that the juror can act impartially and without prejudice to the substantial rights of any party. K.S.A. 22-3410(2)(i). The trial judge is in a better position than an appellate court to view the demeanor of prospective jurors as they are questioned. *State v. Mahkuk*, 220 Kan. 74, 76, 551 P.2d 869 (1976). Challenges for cause, therefore, are reviewed on appeal under an abuse of discretion standard of review. *State v. Johnson*, 253 Kan. 75, 85, 853 P.2d 34 (1993); *State v. Dixon*, 248 Kan. 776, 788-89, 811 P.2d 1153 (1991); *State v. Case*, 228 Kan. 733, 737, 620 P.2d 821 (1980).

Because Manning argues that his Fifth Amendment due process rights were violated, however, we review Manning's forced use of his peremptory challenge de novo. See *State v. Entzi*, 615 N.W.2d 145, 149 (N.D. 2000) (reviewing de novo defendant's argument that his due process rights were violated by his forced use of peremptory challenges).

During voir dire, several members of the prospective jury mentioned that they or their close relatives had been victims of crime. Three members of the prospective jury were particularly vocal about their past. Manning moved the court to remove all three for cause. The trial court removed two of the prospective jurors but did not remove the third. The third prospective juror indicated during voir dire that he would require Manning to prove his innocence. Manning used all of his peremptory challenges. One of the peremptory challenges was used to remove the third juror. Manning does not claim that the seated panel prejudiced him in any way, nor does he claim that his forced use of a peremptory challenge violated his Sixth Amendment right to a fair and impartial

jury. See *Ross v. Oklahoma,* 487 U.S. 81, 88, 101 L. Ed. 2d 80, 108 S. Ct. 2273 (1988) (holding that the Sixth Amendment was not violated when defendant was forced to use a peremptory challenge to excuse a juror who the trial court refused to excuse for cause); *State v. Cox,* 258 Kan. 557, 570, 908 P.2d 603 (1995) (trial court's failure to remove juror for cause does not violate the Sixth Amendment); *State v. Crawford,* 255 Kan. 47, 51, 872 P.2d 293 (1994) (forced use of peremptory challenge does not implicate the Sixth Amendment right to a fair and impartial jury). Manning also cannot claim that any right pursuant to K.S.A. 2000 Supp. 22-3412 was violated. See *State v. Heath,* 264 Kan. 557, 588, 957 P.2d 449 (1998) (holding that any right under 22-3412 was not violated when defendant was forced to use two of his peremptory challenges to remove potential jurors that the trial court refused to remove for cause).

The purpose of peremptory challenges is as a means to achieve an impartial jury. *Heath,* 264 Kan. at 588. The right to peremptory challenges is statutory and is not constitutional in nature. See *Ross,* 487 U.S. at 88 (noting that peremptory challenges are "not of constitutional dimension"). The Constitution entitles a criminal defendant to a fair trial, not a perfect one. *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986); *State v. Chandler,* 252 Kan. 797, Syl. ¶ 3, 850 P.2d 803 (1993).

The failure to excuse a juror for cause does not constitute a ground for reversal unless the defendant was prejudiced. *Crawford,* 255 Kan. at 51. We have consistently held that a trial court's discretion on removing a juror for cause is not an issue and that there is no reversible error where a trial court refuses to excuse a juror for cause and one of the parties subsequently removes the juror using one of their peremptory challenges. See *Heath,* 264 Kan. at 588 (holding that there was no reversible error where trial court refused to remove jurors for cause as defendant subsequently removed the jurors using peremptory challenges); *Crawford,* 255 Kan. at 52-53 (holding that there was no reversible error where defendant had to use one of his peremptory challenges to remove a prospective juror whom the trial court had refused to remove for cause); *State v. Dixon,* 248 Kan. 776, 788-89, 811 P.2d 1153 (1991)

(holding that there were no grounds for reversal on trial court's failure to remove juror for cause as defendant removed same juror using peremptory challenge).

Manning has not shown that the jury which was eventually seated prejudiced him in any way; therefore, even if the trial court abused its discretion in refusing to excuse the third juror for cause, the error was harmless as the juror was subsequently removed by Manning. See *Heath*, 264 Kan. at 588 (harmless error where no prejudice shown regarding jury who sat and heard criminal case); *Cox*, 258 Kan. at 570 (no prejudice against defendant where defendant failed to identify any jurors he would have challenged peremptorily had he not been forced to use peremptory challenges to remove three jurors who trial court refused to remove for cause).

The heart of Manning's argument on this issue lies in his contention that his due process rights under the Fifth Amendment were violated when the court forced him to use one of his peremptory challenges to remove the third juror despite the fact that he cannot show any prejudice or show that the jury which eventually sat and found him guilty was unfair or impartial in any way.

The United States Supreme Court in *Ross* addressed whether the forced use of a peremptory challenge violated the defendant's due process rights because he did not have "the full compliment of nine peremptory challenges allowed under Oklahoma law." 487 U.S. at 89. The Court found no violation of due process rights and held that Oklahoma law required the defendant to use a peremptory challenge in order to excuse a potentially impartial juror. In doing so, the Court stated:

"Because peremptory challenges are a creature of statute and are not required by the Constitution, . . . it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise. [Citations omitted.] As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides.

"*It is a long settled principle of Oklahoma law that a defendant who disagrees with the trial court's ruling on a for-cause challenge must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror.* Even then, the error is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him.

. . . .

"As required by Oklahoma law, petitioner exercised one of his peremptory challenges to rectify the trial court's error, and consequently he retained only eight peremptory challenges to use in his unfettered discretion. But he received all that Oklahoma law allowed him, and therefore his due process challenge fails." (Emphasis added.) 487 U.S. at 89-91.

Manning argues that *Ross* does not apply to the present case because Kansas, unlike Oklahoma, does not require a criminal defendant to use a peremptory challenge to excuse a juror which the trial court refused to excuse for cause in order to preserve the issue for appeal. Indeed, under Kansas law, if a defendant uses a peremptory challenge to excuse a potentially impartial juror, the issue is a nonissue on appeal if there is no showing of prejudice surrounding the sitting jury.

Recently, the United States Supreme Court decided *U.S. v. Martinez-Salazar*, 528 U.S. 304, 145 L. Ed. 2d 792, 120 S. Ct. 774 (2000). The Court in *Martinez-Salazar* broadened the holding in *Ross* by holding that no federal constitutional rights are implicated by the forced use of peremptory challenges. 528 U.S. at 317. In doing so, the Court stated:

"After objecting to the District Court's denial of his for-cause challenge, Martinez-Salazar had the option of letting Gilbert sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal. Instead, Martinez-Salazar elected to use a challenge to remove Gilbert because he did not want Gilbert to sit on his jury. This was Martinez-Salazar's choice. The District Court did not demand . . . that Martinez-Salazar use a peremptory challenge curatively.

"In choosing to remove Gilbert rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. . . . Moreover, the immediate choice Martinez-Salazar confronted—to stand on his objection to the erroneous denial of the challenge for cause or to use a peremptory challenge to effect an instantaneous cure of the error—comports with the reality of the jury selection process. Challenges for cause and rulings upon them . . . are fast paced, made on the spot and under pressure. Counsel as well as court, in that setting, must be prepared to decide, often between shades of gray, 'by the minute.' [Citations omitted.]

. . . .

"We answer today the question left open in *Ross* and hold that a defendant's exercise of peremptory challenges pursuant to [the federal rule] is not denied or

impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause. . . . Martinez-Salazar received precisely what federal law provided; he cannot tenably assert any violation of his Fifth Amendment right to due process." 528 U.S. at 315-17.

In the present case, Manning chose to use one of his peremptory challenges to excuse a juror who was not excused by the trial court for cause. The juror did not sit on the jury which found Manning guilty. The purpose of the peremptory challenge was to prevent the potentially impartial juror from sitting on the jury and affecting the outcome of the case against Manning. A fair and impartial jury was the result. Manning's due process rights under the Fifth Amendment were not violated when he was forced to use one of his peremptory challenges to remove the juror who the trial court refused to remove for cause.

Other state courts have already reached the same conclusion following the decision in *Martinez-Salazar*. See *Entzi*, 615 N.W.2d at 149 (quoting *Martinez-Salazar*, 528 U.S. at 307, and holding that the forced use of a peremptory challenge does not deprive the defendant of "any rule-based or constitutional right"); *Tillman v. State*, 2000 WL 1590993, * 3 (Tex. App. 2000) (referring to *Martinez-Salazar* and noting that due process rights under the Fifth Amendment are not implicated where a defendant is forced to use one of his or her peremptory challenges to remove a juror who was not excused by the trial court for cause).

In a letter submitted pursuant to Kansas Supreme Court Rule 6.09(b) (2000 Kan. Ct. R. Annot. 41), Manning argues that although *Martinez-Salazar* may apply to the present case, "he did not receive a 'qualified' panel upon which he could exercise his peremptory strikes." This argument is without merit. There is no evidence in the record before us, nor does Manning cite to any part of the record in support of his assertion, to indicate that the jury was not "qualified" or was unfair or partial in any way.

## III. POLICE OFFICER'S TESTIMONY

Manning argues that the trial court erred when it refused to grant a mistrial following a police officer's testimony that he knew

Manning because Manning had "sold crack twice in the past to my ex-wife."

A trial court should terminate the trial and grant a mistrial if prejudicial conduct makes it impossible to proceed without injustice to the defendant. K.S.A. 22-3423(1)(c). A decision on a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal absent a clear showing of abuse of discretion. *State v. Vontress*, 266 Kan. 248, 254-55, 970 P.2d 42 (1998); *State v. Stallings*, 246 Kan. 642, 646, 792 P.2d 1013 (1990). The defendant has the burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court. *State v. McClanahan*, 259 Kan. 86, 92, 910 P.2d 193 (1996).

During his direct examination of Sergeant David Kearney, the prosecutor asked if he was familiar with Manning at the time of this case. Kearney responded that he was familiar with him. The prosecutor then asked Kearney how he knew Manning and Kearney responded, "He's sold crack twice in the past to my ex-wife." The prosecutor followed up by asking, "That's how you are familiar with him?" and Kearney stated, "That's how I know him." Manning did not immediately object but instead moved for a mistrial after Kearney's direct testimony was completed. The trial court denied the motion.

It is well settled that in order to preserve an issue on appeal, a timely and specific objection must be made. *State v. Yardley*, 267 Kan. 37, 38, 978 P.2d 886 (1999); *State v. Barksdale*, 266 Kan. 498, 511, 973 P.2d 165 (1999); *State v. Crabtree*, 248 Kan. 33, 37, 805 P.2d 1 (1991). Manning's motion for a mistrial at the close of Kearney's direct testimony does not satisfy the requirement that an objection must be timely.

Furthermore, the evidence that Manning was involved with drugs and the sale of crack was before the jury several times. Manning admitted that he was a drug dealer and user. Manning's defense included the claim that the items found in his house from the robbery were brought there by the State's witnesses to trade for drugs. Canady testified that Manning used drugs. McAbee testified that they went to Manning's house to buy crack cocaine the day of the shooting. The trial court offered to admonish the jury

to disregard the testimony, but Manning reserved his decision to ask for an admonishment until the close of his cross-examination. Manning decided not to ask for an admonition.

The trial court did not abuse its discretion in refusing to grant a mistrial.

## IV. IMPROPER CROSS-EXAMINATION

Manning argues that the State committed prosecutorial misconduct when the prosecutor repeatedly asked him during cross-examination whether the States' witnesses were lying when they testified.

Manning did not object to the manner in which he was cross-examined by the State. We recently discussed prosecutorial misconduct which occurred during closing arguments in *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000). In *Pabst*, we held that prosecutorial misconduct may be reviewed on appeal "regardless of whether the issue of prosecutorial misconduct is preserved by an objection at trial." 268 Kan. 501, Syl. ¶ 2. Our analysis of prosecutorial misconduct requires a finding that the actions of the prosecutor constitute "plain error" in the event there is no objection. The actions of the prosecutor must be "so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal." 268 Kan. 501, Syl. ¶ 3.

The standard of review discussed and applied in *Pabst* also applies when a prosecutor is cross-examining a defendant who has chosen to take the stand.

A prosecutor should be mindful of his or her role in criminal proceedings. The United States Supreme Court discussed the role of a prosecutor in *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935), and stated:

"[A prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from

improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

Questions which compel a defendant or witness to comment on the credibility of another witness are improper. It is the province of the jury to weigh the credibility of the witnesses. See *People v. Riley*, 63 Ill. App. 3d 176, 184-85, 379 N.E.2d 746 (1978) (holding that asking the defendant on cross-examination whether the State's witnesses had told "a bunch of lies" was improper); *Commonwealth v. Martinez*, 431 Mass. 168, 177, 726 N.E.2d 913 (2000) (noting that it was "improper" to ask the defendant to testify as to the credibility of other witnesses when the prosecutor asked the defendant whether a witness was lying); *Commonwealth v. Ward*, 15 Mass. App. 400, 401-02, 446 N.E.2d 89 (1983) (finding that asking a defendant whether a witness lied during his or her testimony is improper and indicating that the error is heightened when a defendant is asked to comment on the testimony of a police officer); *State v. Pilot*, 595 N.W.2d 511, 518 (Minn. 1999) (noting that it is the general rule that asking "were they lying" questions of the defendant has no probative value and is improper and argumentative); *State v. Flanagan*, 111 N.M. 93, 97, 801 P.2d 675 (1990) (holding that it is "well settled" that asking the defendant whether another witness was lying was improper and is prohibited); *People v. Adams*, 539 N.Y.S. 2d 200, 148 A.D.2d 964 (1989) (requiring defendant to characterize police testimony as a "lie" during cross-examination is improper and a tactic to be condemned); *State v. Emmett*, 839 P.2d 781, 787 (Utah 1992) (holding that asking the defendant to comment on the truthfulness of another witness' testimony is improper and prejudicial); *State v. Casteneda-Perez*, 61 Wash. App. 354, 362, 810 P.2d 74 (1991) (noting that the practice of asking the defendant whether another witness had lied during his or her testimony has been "generally condemned").

In *Emmett*, the Utah Supreme Court discussed the dangers of asking the defendant to comment on the truthfulness of another witness' testimony and stated:

"The question is improper because it is argumentative and seeks information beyond the witness's competence. The prejudicial effect of such a question lies in the fact that it suggests to the jury that a witness is committing perjury even

though there [may be] other explanations for the inconsistency. In addition, it puts the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury." 839 P.2d at 787.

Manning cites three incidents in which he alleges that he was improperly asked by the prosecutor to pass on the credibility of another witness. The first incident occurred when the prosecutor asked Manning about Canady's testimony. The following took place:

"Q. I want to see what you are telling the jury. You are telling the jury that your mom framed you for murder because you wouldn't give her crack at the discount, is that what you are telling us?

"A. I don't know, I don't know why she did it. She probably, everybody knows *she was probably lying*, you never know—you never know what crack is or what they are going to say.

"Q. You don't want to call anybody a liar but *your mom is probably lying?*

"A. She probably is, I don't know.

"Q. Let me ask you this, was she lying when she said you had a little silver automatic gun?

"A. Yes, I had a big silver shotgun." (Emphasis added.)

The prosecutor continued to ask Manning about his mother's testimony when the following took place:

"Q. . . . Your mother, the very next day, called the police and tells them that you come in carrying this stuff and telling people that you shot the lady at the liquor store and got all, this loot, *and she's lying, right?*

"A. Most likely." (Emphasis added.)

The second incident occurred when the prosecutor asked Manning about his alibi. The following took place:

"Q. Was there anybody in that entire house that never lost sight of you for a half an hour or so at anytime during the night? Was there someone who was constantly at your side?

"A. Yes.

"Q. Who?

"A. Charles.

"Q. Charles who?

"A. I don't know his last name.

"Q. A guy named Charles never left your side the entire day?

"A. Not really, he's *Mr. Nate Kearney's stepson.*

"Q. Nate Kearney? Are you talking about Dave Kearney?

"A. *Yes, the crooked cop that was lying. He was lying too.* I used to date his wife—his ex-wife. I didn't sell crack to her.

"Q. *Everybody is lying in this case except you,* Mr. Manning?

"A. Probably a few people aren't lying. I don't know. I ain't calling nobody a liar." (Emphasis added.)

The third incident occurred when the prosecutor asked Manning about McKenzie's and McAbee's testimony concerning their trip to the liquor store. The following took place:

"Q. You said your mom probably knows some of these other people. Have you ever seen your mom with these other people?

"A. I don't think so. I never seen my mama with most of her people anyway.

"Q. Let me get this straight, when Lisa McKenzie and Arlandar McAbee come in here and say that you got in a van, went down to the liquor store, ran in, shot and killed the lady behind the counter, took all this stuff, *they're lying, right*?

"A. I didn't say it.

"Q. Did you do it?

"A. No, I did not.

"Q. *Then they're lying*?

"A. I didn't say it.

"Q. And if you didn't do it, *they'd have to be lying, is that right*?

"A. Most likely.

"Q. Okay. So if they had said that, that night when they got picked up, *they were lying*?

"A. Well, most likely."

. . . .

"Q. And even though these people, nobody has ever seen them together, none of them claim to know each other, and they tell the story within the day of when it happened, never having been able to get together to talk about it, they all come up with the same story, and *they're all lying, right*?

"A. Well, my mother went to the—she said she went to the hotel. They probably could have met up there. I know this, I never know my mama, she keeps her stuff on the under for real." (Emphasis added.)

When the prosecutor questioned Manning about his mother's testimony, it was Manning, not the prosecutor, who first broached the subject of lying. The prosecutor, however, continued to ask Manning three more times after that whether his mother had lied. When the prosecutor asked Manning about his alibi for the day of the shooting, again it was Manning, not the prosecutor, who broached the subject of "the crooked cop that was lying."

When the prosecutor asked Manning about the testimony of McKenzie and McAbee, however, it was the prosecutor, not Manning, who initiated the improper line of questioning. On no less than five occasions did the prosecutor ask Manning if the other witnesses were lying. Manning did not object to any of the cross-examination.

The State asserts that it was Manning who opened the door to the "they were lying" testimony by the questions and responses given in his direct testimony. Although the prosecution may present evidence in an area that is normally forbidden after a defendant has opened the door, the "open door" rule does not apply to misconduct of counsel. The "open door" rule only applies to evidence. When a defendant or other witness testifies that another witness has lied in their testimony before the court, the testifying witness is not presenting evidence to the court but an opinion regarding the veracity of another witness. During the direct examination of Manning, the following took place:

"Q. You heard these people testify, heard at least two out of three testify. You heard Lisa McKenzie and Arlandar McAbee testify?

"A. Yes.

. . . .

"Q. You did not go with these people on December 26th down there [to the liquor store]?

"A. No, sir, I did not.

"Q. You heard them testify that you did?

"A. Yes, sir.

"Q. *Were they telling the truth*?

"A. No, sir, they wasn't." (Emphasis added.)

Manning's counsel was no more free to question Manning about the veracity of other witnesses than the prosecutor. It is not the job of the defendant or any witness to comment on the truthfulness of other witnesses' testimony. It is the province of the jury alone to determine the weight and credibility of the testimony. It was improper for Manning's counsel to open the door to questioning the veracity of the State's witnesses' testimony. It was likewise improper for the prosecutor to ask repeatedly of Manning whether McKenzie and McAbee lied. The improper questions asked by the prosecutor were tempered, however, by Manning's responses. The

first two times the prosecutor asked Manning if McKenzie and McAbee were lying, he indicated that he "didn't say it." The third and fourth time the prosecutor asked Manning if McKenzie and McAbee were lying, he responded, "Most likely." The fifth time the prosecutor asked, "They're all lying, right?" but Manning did not directly respond.

Although the "were they lying" questions asked by the prosecutor were wholly improper, given Manning's responses and the evidence against him, we hold that the improper questions did not prejudice the jury against the accused and deny him a fair trial.

Affirmed.

McFARLAND, C.J., concurring in the result.