No. 83,924

STATE OF KANSAS, *Appellee,* v. GYOLA L. DIGGS, *Appellant.*

(34 P.3d 63)

Opinion filed October 26, 2001.

*Mary Curtis,* assistant appellate defender, argued the cause, and *Jennifer C. Roth,* assistant appellate defender, and *Jessica R. Kunen,* chief appellate defender, were on the brief for appellant.

*Elizabeth L. Reimer,* assistant attorney general, argued the cause, and *Stephen D. Maxwell,* assistant attorney general, and *Carla J. Stovall,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Gyola Diggs appeals her conviction for the first-degree premeditated murder, K.S.A. 21-3401(a), of her husband Brian

Diggs. Our jurisdiction is under K.S.A. 22-3601(b)(1) (a conviction resulting in a life sentence receives automatic review by this court).

We consider whether the district court erred: (1) by denying Diggs' motion for a new trial, (2) by granting the State's motion in limine, (3) by allowing an emergency medical technician (EMT) volunteer to testify on how long the victim had been dead, and (4) in failing to give a note-taking instruction to the jury.

Diggs also claims error because of: (a) a denial of effective assistance of counsel, (b) prosecutorial misconduct, and (c) cumulative error.

Finding no reversible error, we affirm.

## FACTS

Defendant Gyola Diggs and her husband Brian lived with their 3 children in Logan, Kansas. Diggs worked as a housekeeper at a nursing home. On the morning of July 30, 1997, she bought supplies for baking cakes, talked with Brian, and baked cakes for almost 4 hours. Brian ate cereal for dinner while he watched television and went to bed around 8:30 p.m. Diggs went to bed around 10:30 p.m. The children spent the night with relatives.

Diggs called 911 at approximately 12:30 a.m., reporting that someone had broken into the house and shot her husband. She testified that after she had fallen asleep, a noise woke her up. She thought one of the children was coming downstairs to the master bedroom. She looked for her sweat pants and glasses and then realized that the children were not home. She said she heard another noise near the bedroom doorway, but she did not see anyone there. She panicked, hid on the floor by the side of the bed, and covered her head with her arms. She heard two loud shots in the bedroom. Then, she heard what might have been footsteps on the wooden floor. She put on her glasses and turned on the light. Brian, who was lying in bed, had been shot in the back of the head. Diggs turned off the light and backed out of the bedroom. Thinking she was going to be sick, she ran to the bathroom. Then, she wandered around, turned on the porch lights, and observed that the exterior door off the dining room was open. Although the door was normally

unlocked, Diggs testified the door was never left open, so she realized that she might be in danger.

The EMTs arrived within 10 minutes of the 911 call. Diggs came out of her house twice as the EMTs stood in her front yard. She said nothing to them. She testified that she watched the EMTs from her kitchen window, "wondering why they weren't coming in." Cathy States, an EMT, followed Diggs inside. States noticed that a fresh pot of coffee was brewing and that the pot was already half full. According to Diggs, she had prepared the coffee before she went to bed, so she simply must have turned on the coffee maker.

Brian was found nude on the bed in the master bedroom. He had two gunshot wounds in the back of his head. States observed that Brian's fingers were stiff. She determined that lividity and rigor mortis had begun to set in. States concluded that Brian had been there for at least 15-20 minutes. The blood on the sheets was dark and starting to dry, and the blood pattern on Brian's back was dry. EMT Robert Noone observed that the blood coming from Brian's nose and mouth was thick and coagulated. Noone also noticed that Brian's hands were stiff and determined that rigor mortis had set in. Diggs told police that she called 911 after the shots were fired and that she was still on the phone when the EMTs arrived just minutes later.

The murder weapon, Brian's .357 magnum, was found in the back of Brian's pickup truck that was parked at the house. Officers found the gun holster on the porch. Diggs said she and Brian were the only people who handled the gun, except for 1 or 2 occasions when her brother used it for target practice. According to Brian's brother, Diggs claimed "she was a better shot than Brian." Brian kept his gun in a box stored in a drawer under their waterbed. Occasionally he left the gun in the glove compartment of his pickup truck or in the kitchen. The Kansas Bureau of Investigation (KBI) investigated the murder. There was neither evidence of a forced entry nor of any intruder. Forensic pathologist Donald Pojman testified that the gun would have been fired within 2 feet of the victim's head.

In 1993, Diggs and the children moved to Logan, Kansas, after the couple separated while living in Colorado. The couple reconciled shortly after the move. Diggs was hospitalized in 1994 after attempting suicide. Several months later, she started attending counseling sessions at a mental health center. She testified that by November 1995, she was "at wits' end." She said she and Brian had the worst argument of their marriage, during which Brian accused her of cheating on him. She said Brian was abusing his prescribed codeine and mixing it with alcohol. Brian taunted her to kill him. Diggs responded, "If it happens, it won't be by my hands because you are doing a good enough job yourself."

A co-worker, Georgia Merklein, testified that Diggs told her the details of a plan to kill Brian. The plan included four steps: (1) making sure the children were at her mother's house, (2) having sex with him, (3) feeding Brian a good meal, and (4) overdosing him on insulin. Diggs also discussed killing Brian with co-worker Archie Dooley. She admitted telling Merklein, "[I]f he [Brian] doesn't stop, I'm going to kill him," but she said that Merklein suggested using insulin so that Diggs would not get caught.

Merklein reported Diggs' threat to the mental health center. Diggs' counselor confronted Diggs with the reported plan to kill Brian. Diggs did not deny making the plan but said "it had all changed now." The counselor and Diggs talked about alternatives, such as divorce and getting Brian professional help. Several days later at work, Merklein found notes from Diggs which suggested that Diggs did not want Merklein to tell anyone of their conversations about killing Brian.

Diggs had Brian committed to Larned State Hospital in April of 1996. She filed for a divorce in May. After receiving treatment at Larned and attending joint counseling sessions, Diggs and Brian reconciled. In March 1997, Diggs told Brian's stepmother that sometimes she got so mad at Brian that "she could just kill him." Brian's brother and father testified that Brian was "doing pretty good" and "feeling better than he had for a long time."

On July 30, 1997, Diggs' brother-in-law, James Gustafson, visited the Diggs' house, so that Brian could work on James' car. Diggs could not think of a time that James had previously been to their

home in Logan. She testified that James and Brian "hated each other" because Brian owed James around $800. James testified that several years ago, he once talked to Brian about Brian's mistreatment of Diggs and threatened to "beat him like a fly" and "keep [him] in [his] own house," like Brian had allegedly done to Diggs. James said that about 2 months before Brian's death, he apologized to Brian, and they became friends.

The KBI's investigation discovered only Brian's latent fingerprint at the scene. No blood was found on Brian's clothing or on the gun.

## DISCUSSION

We first take up Diggs' claim that the district court erred by denying her motion for a new trial. She contends that her rights to a fair trial and due process were violated by the State's failure to disclose an alleged agreement between the State and Archie Dooley, a State's witness, in exchange for Dooley's testimony. Our standard of review is abuse of discretion. See *State v. Franklin,* 264 Kan. 496, 498, 958 P.2d 611 (1998). Diggs filed a pretrial motion in which she requested all exculpatory information. Diggs correctly observes that evidence of an agreement with the State to recommend leniency in the sentencing of a prosecution witness in exchange for the witness' testimony would be the type of evidence that must be revealed to a defendant. See *State v. Wilkins,* 269 Kan. 39, 42, 5 P.3d 520 (2000). If there was a deal between Dooley and the State, there is no question but that the evidence would be exculpatory. See *State v. Aikins,* 261 Kan. 346, 382, 932 P.2d 408 (1997). However, Diggs fails to show that Dooley made a deal with the State before he testified. A brief explanation of how the alleged deal developed is necessary. At a pretrial conference on December 15, 1998, the State raised the issue of a conflict of interest between defense counsel David O. Baumgartner and Diggs. Baumgartner had also represented Archie Dooley. The prosecutor told the court that Dooley was in prison. The State filed a motion in limine to exclude reference to Dooley's convictions for sex crimes and his status as a prisoner. It appears that the motion was granted, since this evidence was not admitted at trial.

About 3 weeks after Diggs' trial, Dooley wrote a letter to the prosecutor saying in part:

"Please be advised, that I am writing you about an agreement that we made regarding my testimony on the murder of Brian Diggs."

The prosecutor replied, saying, "Contrary to your letter, no promises of any kind were made to you in exchange for your testimony. You were specifically advised that no such promises were made. I have no knowledge of any promise or agreement with you in exchange for you testimony." Copies of both letters were sent to defense counsel.

Diggs filed a motion for a new trial based on the alleged agreement between the State and Dooley in exchange for his testimony. Dooley had testified at the preliminary hearing regarding a statement made by Diggs. Dooley had allegedly talked to the prosecutor after the preliminary hearing and asked if the prosecutor "could help [him] out." He claimed that the prosecutor told him, "I'll see what I can do."

At a hearing on the motion for a new trial, the prosecutor testified the alleged agreement was "pure fantasy"; he had made no agreement of any kind with Dooley. He was asked about what he and Dooley had discussed in the courtroom after the preliminary hearing. The prosecutor related that they had discussed the move of Dooley from the Lansing prison to the prison at Ellsworth to be nearer Phillipsburg, the place of trial. According to the prosecutor, Dooley was worried he would be labeled a "snitch" or "rat" and approached the deputy sheriff to have him moved. An official request to the Department of Corrections was made and Dooley was moved to Ellsworth during the trial.

Sheriff Leroy Stephen was present during the conversation between Dooley and the prosecutor. He remembered the prosecutor telling Dooley he would "see what he could do" about sending Dooley back to Lansing. He did not recall an agreement in exchange for Dooley's trial testimony. Dooley was eventually moved back to Lansing.

The district court found:

"[T]his is an attempt on [Dooley's] part to try to get himself out of prison for time that he owes for crimes he committed. The Court finds no credit, no merit in Mr. Dooley's testimony concerning any agreement of Mr. Dooley and [the State] concerning time reduction.

"Besides, his statement simply was is there anything you can do about the time, there was no promise even under his words if that would have occurred, so the court finds no merit in Mr. Dooley's aspect there that would warrant a new trial."

We agree there was no agreement to disclose and, thus, no error.

### The State's Motion in Limine

The State filed a motion in limine in which it asked the district court to prohibit the defense from attempting to impeach Dooley with his sexual crime convictions and his status as a prisoner. Diggs argues that the district court erred by granting the motion, thus preventing Diggs from questioning Dooley about his status as a prisoner. She contends that the court's decision erroneously restricted her ability to impeach the witness. We disagree. The district court did not abuse its discretion. See *State v. Fulton*, 269 Kan. 835, 846, 9 P.3d 18 (2000). Dooley had been convicted and sentenced for two counts of aggravated indecent liberties with a child and one count of aggravated sexual battery. The parties agreed that Dooley's crimes of conviction were inadmissible under K.S.A. 60-421. The sex crimes did not involve dishonesty or false statements. See *State v. Darling*, 208 Kan. 469, 477, 493 P.2d 216 (1972).

### Effective Assistance of Counsel

Next, Diggs contends that she was denied the right to effective assistance of counsel. She argues that a conflict of interest existed because Baumgartner simultaneously represented Diggs and Archie Dooley, a prosecution witness.

This issue involves a question of law, over which we have unlimited review. Our standards for considering a claim of ineffective assistance of counsel are set forth in *State v. Davis*, 271 Kan. 892, 26 P.3d 681 (2001) (citing *State v. Sperry*, 267 Kan. 287, 297-98, 978 P.2d 933 [1999]):

"[A] defendant must establish that: (1) counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than

that guaranteed by the Sixth Amendment to the United States Constitution, and (2) the deficient performance prejudiced the defense, which requires a showing of a reasonable probability that but for counsel's errors, the result of the proceeding would have been different."

At the June 22, 1998, preliminary hearing, Dooley started to testify. The hearing was interrupted by Baumgartner. He told the court in chambers that he used to represent Dooley. After undergoing questioning, Dooley told the court that as a witness for the State, he would be "comfortable" with Baumgartner examining him. Dooley said that he and Baumgartner had never discussed Diggs' case or Dooley's job at the nursing home where Diggs was also employed.

At the December 15, 1998, pretrial hearing, the State argued that there was a conflict of interest in Baumgartner's representing Diggs while he was still representing Dooley. The district court reviewed the time line of events. Brian was killed on July 31, 1997. Around August 1997, Diggs retained Baumgartner as defense counsel. On January 12, 1998, Baumgartner represented Dooley at a plea hearing in an unrelated case. Dooley pled guilty to two counts of aggravated indecent liberties with a child and one count of aggravated sexual battery. Baumgartner represented Dooley at his sentencing hearing on February 9, 1998. Diggs was charged with her husband's murder on April 14, 1998.

The district judge asked Diggs if she wanted the court to appoint an independent attorney to consult with her on the conflict question. She initially declined. The district judge also said:

"The way this case comes up, and the question is, is whether or not he will provide you effective representation of counsel, whether you believe his interest will be divided from your representation because of his representation of Mr. Dooley. Okay. You know, it is your constitutional right for effective assistance of counsel. Okay. And you need to know what's happened here, and it's your desire to waive those, is that correct.

"MS. DIGGS: Yes, sir."

Baumgartner asked for a few minutes to speak with Diggs. At Baumgartner's urging, she asked the district court to appoint an attorney for her to explore the conflict issue. The district court appointed Donald Hoffman, who wrote the following to the court:

"I have visited with Mrs. Diggs by phone and in person. Based upon my conversations with her, it would be . . . my opinion that in view of *State v. Jenkins*, 257 Kan. 1074, the trial court should hold an in-depth hearing on the question of conflict of interest. Upon the scheduling of the hearing, I would anticipate that the court should hear testimony from [Baumgartner] and his former client, Archie Dooley. After Mr. Dooley and Mr. Baumgartner have testified, only then could Mrs. Diggs decide to waive the conflict."

At the conflict of interest hearing, it was noted that Dooley was initially interviewed by the KBI in August 1997. However, Dooley testified that he never discussed the KBI interview with Baumgartner. He agreed that the information he gave Baumgartner dealt solely with charges unrelated to Diggs' case.

Baumgartner testified that during his representation of Dooley he was unaware that Dooley was a potential witness in Diggs' case. He said he did not make the connection when the Attorney General's office gave him a copy of the warrant. He also testified that he did not share any information about Dooley with Diggs.

Then, the district judge questioned Diggs:

"THE COURT: What is your position concerning Mr. Baumgartner continuing to represent you?
"THE DEFENDANT: I wish that he . . . continue.
"THE COURT: If you wish, the Court would appoint additional, another attorney for you. Do you understand that?
"THE DEFENDANT: Yes, I understand that.
"THE COURT: And are you requesting that to happen?
"THE DEFENDANT: No, sir.

. . . .

"THE COURT: How long did you spend with Mr. Hoffman?
"THE DEFENDANT: I would say roughly an hour.
"THE COURT: Okay. And did he discuss with you the issues concerning potential conflicts and the issues concerning Mr. Dooley and Mr. Baumgartner?
"THE DEFENDANT: Yes, he did.

. . . .

"THE COURT: And after going through that and having your own attorney for that issue, are you still prepared to waive any issue concerning conflict?
"THE DEFENDANT: Yes, sir; I am.
"THE COURT: You realize if the Court accepts your waiver here today, if you were convicted by a jury and the matter goes up on appeal, this would not be an issue you could raise again?
"THE DEFENDANT: Yes, Your Honor."

Diggs argues on appeal that despite her waiver, the district court should have disqualified Baumgartner because "an actual conflict of interest existed." We disagree. The fact that a conflict of interest may exist does not lead to the conclusion that counsel's assistance was ineffective. See *State v. Wallace*, 258 Kan. 639, 646, 908 P.2d 1267 (1995); *Schoonover v. State*, 218 Kan. 377, Syl. ¶ 3, 543 P.2d 881 (1975), *cert. denied* 424 U.S. 944 (1976).

Diggs relies on *State v. Jenkins*, 257 Kan. 1074, 898 P.2d 1121 (1995), and *In re Habeas Corpus Petition of Hoang*, 245 Kan. 560, 781 P.2d 731 (1989), *cert. denied* 494 U.S. 1070 (1990). A review of both cases shows that neither is persuasive under the facts here. We observed in reversing Jenkins' convictions that although Jenkins did not object to appointed defense counsel's representation at trial, the district court was aware that an actual conflict existed. At the preliminary hearing, Jenkins' counsel became concerned about the appearance of a possible conflict of interest because she had previously represented a key witness on unrelated burglary charges. In addition, Jenkins had not waived the conflict on the record. *Jenkins*, 257 Kan. at 1087.

In *Hoang*, the petitioner was represented by the Sedgwick County Public Defender's Office. The day before trial, defense counsel learned that his office had represented Binh Van Tran, the key prosecution witness against Hoang. The next day, the district court was informed of this situation after opening statements. The district court was concerned with counsel's anticipated cross-examination of Tran, but counsel noted that Tran had been represented by another attorney in his office and counsel did not believe he had a conflict. The State objected. Defense counsel was disqualified. The district court declared a mistrial. New counsel was appointed. Hoang sought dismissal of the charges, arguing that the mistrial had been granted improperly. 245 Kan. at 561. We disagreed and affirmed, holding that the district court did not abuse its discretion in granting the mistrial.

Diggs' situation, unlike either *Jenkins* or *Hoang*, probed the necessity of disqualifying Baumgartner before trial. Here, Baumgartner brought the possibility of a conflict to the district court's attention. As required under *Jenkins*, the district court initiated an

inquiry, considered the facts at a special hearing, and prudently appointed independent counsel to insure that Diggs' Sixth Amendment right to counsel was not violated. See *State v. Bowen*, 27 Kan. App. 2d 122, 129-30, 999 P.2d 286 (2000) (finding that the court must initiate an inquiry where it is advised that a potential conflict exists) (citing *U.S. v. Migliaccio*, 34 F.3d 1517, 1527 [10th Cir. 1994]). In addition, Diggs fails to show that Baumgartner's representation was inadequate. Dooley's unrelated case was over. His convictions and prisoner status were not admissible at Diggs' trial. No aspect of Baumgartner's previous representation of Dooley affected the cross-examination. Moreover, Diggs waived any possible conflict on the record. The district court did not err by allowing Baumgartner to remain Diggs' defense attorney.

## Prosecutorial Misconduct

Diggs contends that the prosecuting attorney committed misconduct (1) during opening statements, (2) while cross-examining Diggs, and (3) in closing argument, thus depriving her of her constitutional right to a fair trial.

### Opening Statements

We first consider Diggs' opening statement claim. She acknowledges that she did not object to the prosecutor's opening comments at trial. However, the contemporaneous objection rule does not apply to opening statements because it is impossible to foresee which comments counsel might fail to establish through the evidence at trial. "Absent substantial prejudice to the rights of the defendant, there must be a showing of bad faith on the part of the prosecutor before relief may be granted as a result of a prosecutor's reference in his opening statement to matters not provable or which the prosecutor does not attempt to prove at trial." *State v. Ruebke*, 240 Kan. 493, 503-04, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

Diggs focuses on the following five comments made by the prosecutor in his opening statement:

(1) "And she's [Diggs] talking to Georgia [a witness for the State] and she says, asks Georgia what was the best way to kill somebody and not get caught."

(2) "And then the defendant starts expressing to Georgia Merklein again that she wanted to kill her husband, making statements beginning in March 1996, all the way up until April, May, 1997, two months before the murder, that if she could kill him and not get caught, she would. She tells her that over and over again."

(3) "The rest of the gun was wiped clean."

(4) "What they discover is that the defendant told many, many people what happened that night, and each time she told the story, it was a little bit different because when you tell the truth, ladies and gentlemen, the story stays the same because you have the basis as the truth. When you're lying, it gets different a little bit because you don't remember what you told the last time. Okay."

(5) "[Brian] had obviously eaten a big meal."

At trial, Merklein testified that (1) Diggs told her "she would kill Brian if she knew she could get away with it," to which Merklein volunteered that insulin was the only way that could happen, (2) she volunteered information to Diggs all day about using insulin, (3) in March 1997 (not 1996), Diggs said she wanted to kill Brian, and (4) Diggs discussed killing Brian many other times.

A forensic scientist for the KBI testified that the only fingerprint found on the murder weapon was that of the victim. Although the prosecutor erroneously stated in opening statements that the gun had been wiped clean, this error was dispelled by the cross-examination of the KBI scientist. Thus, Diggs was not prejudiced by the misstatement.

Diggs also complains that the prosecutor said the forensic pathologist would testify that "there was a lot of gastric contents, [the victim] had obviously eaten a big meal." On cross-examination, forensic pathologist Donald Pojman testified that the victim had 200 cubic centimeters of stomach contents, or about 5 to 7 ounces of fluid. Diggs essentially disputes whether this amount consisted of "a lot" of gastric contents. When asked if there was any indication that Brian ate a large meal before his death, the doctor said, "If he would have, it would have been several hours prior to death." His written report said he found 200 cubic centimeters of gastric contents.

Diggs contends that the jury could have thought it was mistaken about what they heard from witnesses and could have resolved any confusion by relying on what the prosecutor said in opening state-

ments. Diggs has not shown prejudice or bad faith by the prosecutor. See *Ruebke*, 240 Kan. at 503-04.

### Improper Cross-examination of Defendant

At trial, Diggs took the stand in her own defense. On appeal, she argues that the State committed prosecutorial misconduct during her cross-examination by asking her to comment on the truthfulness of the State's witnesses.

Twice, Diggs' objections were sustained when the prosecutor asked if a witness was "lying" or "mistaken." However, as the State points out, Diggs largely failed to object to the manner in which she was cross-examined by the State. In *State v. Pabst*, 268 Kan. 501, Syl. ¶ 2, 996 P.2d 321 (2000), we concluded that prosecutorial misconduct may be reviewed on appeal "regardless of whether the issue of prosecutorial misconduct is preserved by an objection at trial." The plain error rule may be used when "the prosecutor's misconduct is so prejudicial or constitutes a constitutional violation which, if not corrected, will result in injustice or a miscarriage of justice." *State v. Sperry*, 267 Kan. 287, 309, 978 P.2d 933 (1999). This standard of review is applicable when a prosecutor is cross-examining a defendant who has chosen to take the stand. *State v. Manning*, 270 Kan. 674, 697, 19 P.3d 84 (2001).

Diggs cites instances involving at least six different State's witnesses. The first incident, which is representative, occurred when the prosecutor asked Diggs about the testimony of Georgia Mercklein, a co-worker. The following took place:

"Q. [PROSECUTOR]: Okay. So you would deny, when Georgia Mercklein told this jury that you asked for help in committing this crime, *that would be true or false?*
"A. *That would be false.*

. . . .

"Q. And you admitted to [Betty Stamper] that you had a plan in effect to kill your husband, *is that not true?*
"A. Yes.
"Q. Okay. And she asked you about the plan, *true?*
"A. No, no; she didn't ask me.
"Q. She didn't ask about the plan. So when she testified she did ask you about the plan, *was she lying or mistaken?*

"A. She did not ask me about the detailed plan and I believe she said so in her testimony, that we discussed alternatives to this plan.
. . . .

"Q. You heard the testimony of Georgia Mercklein when she told us in March of 1997, you again said, 'If I could kill him and get away with it, I would do so.' Do you remember her testimony?
"A. I do.
"Q. *Is that true or false?*
"A. That is false.
"Q. *Is she lying or mistaken?*
"A. She is lying.
"Q. *She is lying?*
"A. I don't believe she's mistaken." (Emphasis added.)

A review of the record shows that in her testimony, Diggs contradicted the testimony of some of the State's witnesses and agreed with testimony of others. We reject the argument that the defendant opened the door to the "they were lying" testimony by questions and responses given in the defendant's direct testimony. See *Manning*, 270 Kan. at 701. The prosecutor's asking Diggs if other witnesses lied or were mistaken was improper. See *Manning*, 270 Kan. at 702. Had the prosecutor merely asked about her previous statements to witnesses, allowing the jury to draw its own conclusions regarding the witnesses' credibility, the cross-examination would have been unobjectionable. See *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995).

Our analysis of prosecutorial misconduct requires an examination of whether the improper questions prejudiced the jury and denied Diggs a fair trial. See *Manning*, 270 Kan. at 697. Diggs contends that the prosecutor's questioning tactics require a reversal of her convictions. We disagree. Given Diggs' responses and the circumstantial evidence against her, the cross-examination did not prejudice the jury against Diggs and deny her a fair trial.

### Misconduct During Closing Arguments

Diggs also contends the prosecutor committed misconduct during closing arguments. Generally, reversible error cannot be predicated upon a complaint of prosecutorial misconduct during closing arguments where no contemporaneous objection is lodged. *State v. Finley*, 268 Kan. 557, 571, 998 P.2d 95 (2000). We have no

objection here. However, if the prosecutor's statements rise to the level of violating either a defendant's right to a fair trial or the Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. 268 Kan. at 571.

The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we must decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, we must decide whether the remarks are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial. *State v. Campbell*, 268 Kan. 529, 539, 997 P.2d 726 (2000) (citing *State v. Lumley*, 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 [1999]).

We have reviewed the State's closing argument and find the prosecutor's comments were within the bounds afforded counsel for argument.

Diggs argues that the prosecutor misstated the State's burden of proof and erroneously shifted the burden to the defense. She notes that we have held that the term "reasonable doubt" does not need to be defined because the words themselves describe the meaning. See *State v. Dunn*, 249 Kan. 488, 493, 820 P.2d 412 (1991) (finding that "[a]lthough the instruction given failed to define reasonable doubt, the instruction is neither erroneous nor an incorrect statement of the law"). Diggs contends that the prosecutor erred by equating the "reasonable doubt" standard with "common sense" or "reasonable explanation." She argues that the burden was shifted to Diggs when the prosecutor repeatedly asked the jury to consider whether Diggs' actions were "reasonable."

Here, unlike *State v. Mitchell*, 269 Kan. 349, 357-61, 7 P.3d 1135 (2000), the prosecutor did not define reasonable doubt as "common sense," nor did he define it as a "reasonable explanation." He told the jurors that they could apply common sense to the facts in their deliberations, including the determination of whether rigor mortis had already started setting in when the EMTs arrived at the scene of the murder. It appears that the prosecutor questioned whether certain facts were "reasonable" in order to argue to the jury that the facts did not create a reasonable doubt.

Not only did Diggs not object to the prosecutor's argument, she also agreed with it. Her counsel said in closing:

"The State has that burden and that burden has to be beyond a reasonable doubt, and I agree entirely with [the prosecutor]. It's not beyond any doubt, it's beyond a reasonable doubt."

## The EMT's Testimony

Diggs argues that the district court erred by allowing Cathy States, an EMT volunteer, to testify concerning how long Brian had been dead when she arrived at the scene. She asserts that such an opinion was beyond States' training and qualifications. Whether an expert or lay witness is qualified to testify as to his or her opinion lies within the discretion of the district court. *State v. Canaan*, 265 Kan. 835, 848, 964 P.2d 681 (1998).

States was a volunteer EMT for Phillips County and responded to Diggs' 911 call. At the preliminary hearing, the prosecutor asked her, "[I]n your impression, did you feel that you arrived on a scene that had just happened, or did you arrive on a scene that had been there a while?" Baumgartner objected, saying, "She's giving a lay opinion about something that's in the realm of professionals, Your Honor." The court sustained the objection.

Diggs subsequently filed a motion in limine, in which she urged the court to limit the testimony of the EMTs at the scene of the crime. She argued that none of the EMTs who responded to the call had the qualifications to address issues such as rigor mortis, livor mortis, or the coagulation time of blood. The district court reserved judgment on the motion until it could hear the witnesses' testimony.

At trial, States testified that she was trained to deal with trauma and illness. She had learned to look for signs and symptoms showing that an injured person had been "gone too long to resuscitate." States testified that to make such a determination, she looked for lividity (pooling of blood) and rigor mortis (stiffness of joints).

Baumgartner objected to States' talking about "rigidity," "lividity," and rigor mortis. The objection was overruled. Later in States' direct examination, Baumgartner's objection as to "lividity" was sustained. The district court ruled that States could indicate what

she observed, but she was not to use the medical term "lividity." When asked whether, based upon her training, rigor mortis was present, she testified that she thought it was. She also testified that the victim's blood "appeared to be starting to dry and maybe clotting, looked like it had been there and had dried up somewhat more than [she] expected to see." She said, "It's very obvious that [the act] has just happened [when] the blood is still very wet and bright colored." The prosecutor then continued to establish a foundation for States to testify on "lividity." The opinion testimony objected to on appeal developed through further prosecution inquiry. After States testified that she determined that lividity was present in the victim, she concluded that the victim "had been there more than 15 to 20 minutes."

"A. As I understood it, [lividity] it was present.
"Q. Which indicated to you what?
"A. That he had been there more than 15 to 20 minutes.
"MR. BAUMGARTNER: I'm sorry, I didn't hear her answer.
"THE WITNESS: That he had been there more than 15 to 20 minutes."

No objection was made at this point. A timely and specific objection to the admission of evidence is necessary to preserve an issue for appeal. *State v. Jamison*, 269 Kan. 564, 569-70, 7 P.3d 1204 (2000).

On cross-examination, States admitted that this was the first time that she had observed what she believed to be lividity and rigor mortis in a victim. She did not know what effect the presence of brain matter would have on the timing of the coagulation of the blood. She did not know how long it takes blood to coagulate, nor did she know if the fact that the victim was laying on a waterbed would affect the timing of the coagulation of the blood.

We have found that to be competent as an expert, a witness must be skilled or experienced in the profession to which the subject relates. *State v. Willis*, 256 Kan. 837, 839, 888 P.2d 839 (1995). An expert witness " 'must be qualified to impart to the jury knowledge within the scope of his special skill and experience that is otherwise unavailable to the jury from other sources.' " 256 Kan. at 839.

Diggs relies on *Willis*, 256 Kan. 837, and *State v. Bressman*, 236 Kan. 296, 689 P.2d 901 (1984), to support her contention that

States should not have been permitted to draw such a conclusion. In *Willis*, we concluded that the district court erred in allowing a social worker to testify as an expert in the psychiatric field of post-traumatic stress disorder and rape trauma syndrome. 256 Kan. at 847. In *Bressman*, the emergency medicine physician who examined the victim at the hospital testified that, in her opinion, the victim had been raped. We noted that expert testimony that the victim had been raped "of necessity had to pass upon the credibility" of the victim's story. Thus, we concluded that the district court erred in admitting the physician's expert opinion. 236 Kan. at 303-04; *cf. State v. Hayes*, 239 Kan. 443, 447, 720 P.2d 1049 (1986) (finding that in a rape case, testimony of an attorney/rape counselor was limited to her actual physical observations and could not be extended to the area of expert opinion evidence on the medical probability of trauma).

In looking at States' testimony, it appears that she testified as to her personal observations, basing her observations on her experience as an EMT. When she moved the victim's fingers, the joints were stiff, suggesting to her that rigor mortis had begun. She noticed that the blood found at the scene was darker and dryer than she expected to see. She explained that she was trained to recognize lividity, or pooling of the blood, in victims in order to make a determination on whether to attempt resuscitation. She observed that lividity was present in the victim's body. Based on her observations, she concluded that she and the other EMTs should not attempt resuscitation.

However, States also testified that lividity indicated to her that the victim "had been there more than 15 to 20 minutes." Although determining the time of death was not within the scope of the special knowledge, skill, experience or training of States, the observations of an EMT regarding rigor mortis and lividity appear to be permitted in other jurisdictions. See *Nicholson v. State*, 319 Ark. 566, 573, 892 S.W.2d 507 (1995) (finding no prejudice where an EMT testified that when she arrived at the scene, "[s]he found a cold body with blood pooling which indicated [the victim] had been dead 'quite a while' and more than the ten minutes or so which would have been consistent with [the defendant's] testimony");

*Mayes v. State*, 887 P.2d 1288, 1303-04 (Okla. Crim. 1994) (finding no fundamental error where an EMT testified that "[w]hen he loaded the body between 9:30 and 10 p.m., rigor had begun; and the body exhibited substantially more lividity, and was colder than it had been six hours earlier").

States was not qualified to testify about the length of time Brian had been dead. Although no specific objection was made to the length of time question, Diggs' counsel earlier had filed a motion in limine and had objected to the line of questioning during States' testimony. While Diggs' contention presents a close question, we conclude that any error was harmless because of other medical testimony.

Dr. Pojman, a forensic pathologist and deputy coroner, testified that the effect of brain matter in the blood causes the blood to begin clotting almost immediately. Blood on sheets or clothing would begin to clot within 5 to 10 seconds. He agreed that it would not have been uncommon to have seen dry blood on the victim's back within 10 to 15 minutes of death. By 20 minutes later, most of the small spots of blood would be completely dry. Dr. Pojman also testified that the victim's waterbed temperature was set between 85 and 90 degrees. According to Dr. Pojman, a heated waterbed would decrease the clotting and drying time. He also agreed that rigor mortis generally begins 2 to 4 hours after death.

Dr. Pojman's opinion was consistent with the States' observation that the victim had been there more than 15 or 20 minutes. Diggs was not prejudiced by States' testimony.

Note-taking Instruction

Diggs contends that the district court erred in failing to instruct the jury regarding note taking. This contention lacks merit. Diggs admits that she did not request such an instruction at trial. We review this issue under a clearly erroneous standard. See K.S.A. 2000 Supp. 22-3414(3). Failure to give an instruction is clearly erroneous only if an appellate court reaches a firm conviction that there is a real possibility that the jury would have returned a different verdict if the instruction had been given. *State v. Coleman,*

271 Kan. 733, 739, 26 P.3d 613 (2001). The failure to give a formal note-taking instruction was not clearly erroneous.

Cumulative Error

Finally, we find no basis in the record to support Diggs' contention of cumulative trial errors warranting reversal.

Affirmed.